We turn to the final case on the calendar today, which is APEX Employee Wellness Services versus APS Healthcare Bethesda, Inc. Mr. Rosenbaum. Good morning, Your Honors. May it please the Court, Zachary Rosenbaum of Lowenstein Sandler, LLP, on behalf of the appellant by short form APS. This case, and in particular this appeal, centers on the following question, which permeates principles of both contract law and equity. And that is, is respondent, in short form summit, entitled to over $2.2 million for health screenings it did not conduct, it did not plan for, and it did not staff? The answer we submit is resoundingly no. Why a fake contract said so? You know, one could look at it, and I'm not saying that this is what one should do, is that you signed a contract that you thought would be very favorable to you because you were getting $43 for something that you had to pay out $37. And that's a great contract. I mean, gee, I'd love to have a contract like that. The contract had a clause in it, quite clear, that said something else. And it turned out that that contract, that clause, made a contract that you thought was very favorable to you, unfavorable to you, at least until you saw what it was doing and said, stop, give us a new estimate. Why isn't that just, that's a contract you made? You're both grownups? You win on some, you lose on some, and too bad. Now, you know, if you were a poor widower or a poor widow, we might say, gee, you didn't understand the contract, but you understand the contract as well as anybody and made it to win, and you lose. Why is equity, why is unfairness, why is the fact that they make money anything we should be the least bit interested in? Well, for a multitude of reasons, and I'd like to start with contract interpretation, because our first argument and our leading argument is that there are mixed factual and legal issues, even combined within the question Your Honor just posed. The legal question is, can, based on principles in New York of contract construction, which state that in determining whether a contract is ambiguous, a court looks to the contract as a whole, so there's a contextual approach, but within the four corners of the contract. In light of the circumstances present when the contract was entered, and here you have an interesting contract, and frankly one there's not a lot of case law on, where you had about ten weeks of performance, of actual course of performance at the point at which the parties executed the contract. I think that goes to the second piece of what I just described, which is the circumstances present when the contract was entered, but I first want to focus on the initial aspect, which is the contract as a whole in full context, and where I think the district court erred on a summary judgment record, is that first textually, while the court properly looked to a dictionary definition of the term projection, and I don't think anyone in this courtroom disputes that a projection is a type of estimate, but it's a type of very informed estimate that requires current trends. And while the court acknowledged that definition, it also acknowledged that what Mr. Watson had provided to Summit prior to the contract having been entered were mere guesses. And if you look at the definition of a guess, which is, well I have it in my notes, is to form an opinion based on little or no evidence, versus the definition of a projection, they're markedly different things. Can't you have a projection based on a guess? I don't believe so. A projection requires current data or trends, and certainly not under this contract, because as we point out in- Based in part on a guess. So you've got 75% of the data, but the remaining 25% is based on a guess. Is that a projection, or is that something else? If it's something else, what is that? That's probably an estimate, frankly. I mean, the way I've looked at this, and I've studied the dictionary definitions of all three, a projection is the most refined form, right? In a sense, all are trying to predict the future. But a projection is the most refined form of prediction because it is, by definition, under both Oxford- Under your definition of projection, in this record, when, if at all, did APS provide Summit with a projection? The projections that APS provided were as soon as the performance began. What actually happened, and it's reflected in admissions from Summit, from its COO, was that both parties were looking to the sign-up sheets, which was the online registration system. Let me repeat my question. When, if at all, did APS provide projections to Summit? APS provided projections to Summit by referring Summit to the online system- Let me put the thing in a slightly different way. That's fine. I'm sorry, did I not answer your question? Not really, but go ahead and answer it. Suppose that Summit had actually staffed on the basis of what you sent them. They didn't because they chose to do other things, because they chose to read the contract in a way which would be favorable. But suppose they had staffed it that way. Would that make this, that you gave them, any less a projection? In other words, is your claim that this isn't a projection because you don't like the fact that they made money on it? But would it be a projection if it had actually gone out and sent out all the people on the basis of what they said, and then said, hey, we got a right to this money? In other words, I want to find out if you're arguing that the contract doesn't say that, or if you're arguing it's unfair. I think you're arguing it's unfair. No, no, I am not, and I think it's a fair question. And I do think that there was a sharp tactic here and there was a gotcha result. But I think that based on the context of the whole agreement, and I want to point to Exhibit A, Section G6. In your example, Your Honor, it should never happen that there are overestimates by tens of thousands. Because Summit, and I think this is in part where the district court went wrong contextually, Summit undertook to organize and coordinate all planning and related logistics. And coordinate its planning and any changes to that planning, and it's expressed in the agreement with APS. So it was the derivation or the creation of what should have been a projection, should have been something that using the expertise of Summit, which was their obligation. That's Exhibit A. That's Exhibit A. Let's look at Exhibit B, which is entitled Fees. There are two references to this 90% figure. The first is on A67, standard minimums, health screening clinics, 40 screenings or 90% of customer projection, whichever is greater. And that's the projection that we've been talking about, correct? Correct. On A68, there's what's called small clinic fee, 40 participant clinic minimum, and then it refers to or 90% of the estimate for that clinic. What's the difference between customer projection on 67 and, well, 40 screenings or 90% of customer projection on 67, and 40 participant clinic minimum and 90% of the estimate on 68? I don't think you can read either of those two without reading the other use of the word increase to estimated participation in subsection 4, which is sandwiched between those two provisions. In other words, there may be no difference, Your Honor. I certainly . . . There was a material difference. No, I didn't. In other words, where I think the district court went wrong was it made a factual finding that what Mr. Watson had provided before the contract was entered, and we note in our papers that the contract itself canceled all prior discussions and arrangements. The court made a factual finding that what he provided were the projections contemplated under this provision. Or estimates contemplated. Or estimates, and where I think the district . . . And I tried this case where I think . . . And I didn't argue it on summary judgment. I stepped in after summary judgment. Where I think the district court went wrong was in that factual finding it didn't . . . But I want to get to Your Honor's question because . . . Let me come back to that. Let's suppose that on the basis of that, they staffed this assuming that there would be all the people that these guesses suggested there would be. Would you say they wouldn't have a right to recover? I would say that is a much more reasonable reading of the contract, particularly because this provision that's sandwiched in, it says if in 10 days or less prior to the clinic, and I'm looking at sub 4 on A68, if in 10 business days or less prior to the clinic, customers should increase its participation estimate sufficiently to require Summit to increase the number of staff, Summit shall directly invoice customer an expediting fee of $300 for each increase in staff members. So if you look contextually at this, just the standard minimums provision, it uses projection once. It uses participation estimate. Then it uses estimate. I think we can all agree that's imprecise drafting. But if you're trying unambiguously, and I've read this contract probably a thousand times, I truly believe it's ambiguous. If you try to discern anything from those provisions, is it inextricable link between estimates and staffing? Otherwise, it gets me to the commercially absurd result. Why possibly would anyone give this estimate with the understanding that you can throw it in the garbage, but you get to bill me for 90% of it? You have nothing to lose. In fact, you have everything to gain, and you have an incentive to mislead me because it goes back. So let me ask you again, because I'm not sure you did answer my question. What projections did you give in connection with billing? And when? So anything prior to March 15, 2011, was not a projection. It was a guess. After March 15, 2011, at the insistence of APS, our client gave participation estimates or projections that were based then on the actual trends. So from January whatever it was, the beginning, to March 18, there were no projections that Summit could use to bill? Well, Your Honor, I think I need to be even more precise on that. The supposed projections that Summit is purporting to bill APS for were given in December. Well, that was 100,000. No, no. What was the projection in December? So what happened was is that the vast majority of what Summit calls projections we call guesses, but let's go with estimate. The vast majority of them were given pre-contractual, before the contract was signed and before it became effective. And those are the ones that are predominantly at issue in this appeal, and those are the ones that the district court found to be customer projections. How does that cut? Excuse me? What difference does it make if they were made before? I mean, one could argue when you sign a contract using projections, if these were projections, then the fact that they were made before and you signed the contract after would just say you know what you're talking about. I mean, I don't know that it matters one way or the other, but I don't see that it cuts in your favor. Well, the reason I believe, among others, it cuts in our favor is a projection requires current data trends. There couldn't be any pre-contractual. Two, the contract itself in Section 15 says that all prior discussions, discussions, and it says oral or in writing, are canceled. So that to me is at worst for me. The creation of an ambiguity, I think it ultimately may be dispositive if this court goes back down to the trial court, because how else can you read that provision? It says that all discussions and arrangements orally or in writing related to the subject matter of this agreement are hereby canceled. That was on March 15th. I think that actually makes sense in a commercial relationship, particularly because everyone knew at that point that no one was using the estimates to staff the clinics. I know I'm well over time. No, it's okay, Mr. Rosenbaum. Thank you very much. We reserve some time. May I please the court? Jeff Butler for the Apolli and Cross Appellant. We're the assignee of Summit Health. The minimum fee provision that's at issue in the case is not a mechanism for generating gratuitous fees. It actually serves a useful commercial function. Like any event planner, Summit Health would benefit from having an accurate estimate of how many people would attend these clinics for screenings. And the minimum fee provision provides an incentive to APS to provide accurate estimates. I mean, it could have been anywhere from 50,000 to 100,000 people. There's evidence in the record that there were 100,000, and I think it's cited in APS's brief, there were 150,000 planned participants in the state of Tennessee. So there was a lot of concern throughout this program that a huge number of people were going to show up at any given point in time. And, in fact, when this issue arose in March, there was an effort made by Troy Watson and his team in Tennessee to try to revise the estimates and make them more accurate. He testified that he, or in his deposition, he said that he created a new set of lower estimates, but he decided not to use them because of the potential for an influx of participants in the latter part of the year. But what I wanted to say is that the, so this provision effectively created a kind of penalty for APS if they overstated their estimate, if they estimated too high. And there's nothing unfair about that because APS had total control over the minimum fees. There was only one input into the formula, and that's the estimate that APS provides to Summit Health. So they could have easily controlled the minimum fees charged by either making reasonably accurate estimates or even estimating a little on the low side to make sure that these minimum fees don't accrue. Now, APS didn't do that. Why not? Well, we know in hindsight that APS wasn't paying any attention at all to these minimum fees. They approved Exhibit B. They approved the schedule of fees, but they didn't pay much attention to it after that. So they didn't inform the team that was on the ground in Tennessee about the consequences of providing high estimates, and they didn't do anything to keep track of the- Let's go to Mr. Watson in Tennessee. Mr. Watson and his team and his boss, Bob Hines and Jim Shulman, they apparently were not aware of this provision. But that's not Summit Health's fault. APS management has a responsibility for keeping its people informed, and it had all the information that it needed to calculate the minimum fees because it's providing the only input into the minimum fees. If they had given very low figures and because of that you had not staffed that adequately, and because it wasn't staffed adequately, some people sued them as not providing the services that they had agreed upon with Tennessee, and they came back and sued you, I take it you would have said, Look, you did what you did because you didn't want higher minimum fees, so of course you can't sue us for not staffing. That's exactly right. I mean, the way that, you know, APS, we were already protected from the risk of low fees or low estimates, right, because if the estimates were low and we understaffed the clinics and people were turned away, the state of Tennessee would be very unhappy with APS. That's the client. That's the client of APS. We're a subcontractor, right, so they're the ones who are dealing with the state of Tennessee. There's lots of indications in the record that there were issues that they had with the state of Tennessee, and they particularly- Your client could not deal directly with the state of Tennessee in connection with APS. No, I mean, I think there were some meetings where handshakes took place, but we didn't have a direct line into the state of Tennessee. We dealt with APS. APS dealt with the state of Tennessee. So if the estimates were low, it wouldn't have required a lawsuit. A state of Tennessee would- Their argument is that you cannot have projections at least until the thing started, that the word projection means that it is in the thing, but as a practical matter, that that word does not permit them to do anything, that anything they said was not part of a contract at least until things got started, and that that's why these December things are meaningless. Well, and I certainly disagree with that, Your Honor. I'm sure. I mean, the contract was, from our perspective, the contract was entered, or the pricing terms were fully agreed upon in December before any clinic took place, and the fact that we, and the pricing terms clearly allow us to use a projection or an estimate to calculate minimum fees. The fact that the projection, some of the projections were provided even earlier, I don't think changes anything. I mean, it doesn't change the significance of them. Remember, the APS witnesses involved testified that these were actually APS's good faith estimates of how many people would come to each clinic, and there's only one set of those estimates that was provided through the course of the program. Some were provided in December. Some were provided as the program continued, but if there's only one set of estimates, of course we could use them to charge minimum fees, and this distinction between estimate and projection is a very fine distinction, and I don't think one that ordinary people use in their ordinary lives. Not even Mr. Watson really embraced. During the course of this case, everyone involved has found it hard to avoid using those terms interchangeably, but even if we accept the definition, the definition of projection is actually that it has to be an estimate that's based on a study or a current trend. I think those are the words that are used in some of the dictionary definitions, and these projections provided by Mr. Watson, they were based on a study. We presented evidence on summary judgment that Mr. Watson had access to demographic information about where state employees were located in different locations, and he used that demographic information to come up with his estimates. They had a formula of 70% of planned participants plus 30% of spouses, or a 30% figure to account for spouses, and he also talked to the local benefits coordinator in each of the locations where the clinics were going to take place, and he consulted with his bosses, Bob Hines and Jim Shulman. He then made a guess. And he then made an educated guess, which I think would qualify as both an estimate and a projection, even under Mr. Rosenbaum's very exacting definition of projection. Mr. Butler, I wonder if you could just step back a bit in this case, and for my benefit approaching this context in total ignorance. How does this work? Why is this contract as a commercial matter created in this way? What explains the structure of this agreement? I guess I don't understand exactly what you're asking. Why is this contract this contract? That is, why is this the way in which these two parties establish their relationship? Well, I think that this was a fairly standard structure for contracts in this area. There's a basic per-screening fee that is charged, and there's a lot of negotiation over that per-screening fee, which certainly happened in this case. They brought us down from $43 to $37. Well, I guess I'm getting at it. You have to make calculated guesses about projections, if you will, about the future. Is there not another way of doing this so that the actual services are paid for? Certainly. The parties could have structured their contract differently, more like lawyers, for example, where we get paid for the time we spend doing things. But there's a variety of ways the contracts could be structured. And what is the purpose of this arrangement? What is the goal? What's the theory, if you will? Well, I hesitate to answer that, Your Honor, because I'm not sure there was a theory behind it. It's more commercial practice in this business. Why the commercial practice? Because that's what contractors like APS were demanding from subcontractors like APS. Is it that they want to know what they will have to pay ahead of time, and therefore they set a set amount and a minimum fee which is based on their projections so that they know what that will entail, so that they aren't opening it to a situation where they may end up having to pay more if you do it like a lawyer's contract or a different thing? I don't know. I'm really asking Judge Cabranes' question in a different way and just asking, is that a possible reason for it? I mean, I'm not sure there was so much thought into the theory of how this contract was constructed. This is just the way they did their contracts in the standard practice in this business, to have a minimum fee or to have a per-screening fee. And, of course, you have to organize your business if you're a subcontractor like Summit Health so that you think you can provide not only the staffing, but they had to provide supplies, some of which were ____. All of these other overhead costs. All these other overhead costs, the appointment system, the feed of data. But it seems to me that APEX has significant control. It has a $6 delta, plus it controls the estimates. It controls the amount of potentially, I mean, assuming good faith, maybe not full control, but has significant control over the amount that it pays as a minimum. Correct. And they have a lot more information to use to come up with the estimates. But from Summit's perspective, this contract entailed a lot of risk. It could get things wrong in a lot of ways in which APS would be unhappy with it if its staffing wasn't correct or if it had to turn people away from the clinics. So it wasn't an ideal structure in some ways for Summit Health. But that's just the practice in the industry. Tell us something about your cost appeal. Yeah. I wanted to get to that before I ran out of time. So, you know, I think that there's, as I said, there was no dispute on summary judgment about the projections that were actually provided by APS. There's one set. Those are reflected in documents. There was no evidence of an alternative set of estimates that was ever presented. But what was in dispute was the significance of this email from Bob Hines, who was an APS employee in Tennessee. And the district . . . Stop. Stop doing what you're doing. Yeah. The district court found that that email created an issue of fact concerning the projections that were actually provided by APS. But as I've mentioned, there really was no issue of fact concerning the projections that were provided. So in our view, this Hines email really presents only a question of law that should have been decided by the district court on summary judgment. Could you read what they said as saying, these are no longer valid projections? I think . . . Isn't that a matter of ambiguity that a jury could decide? I don't think so, Your Honor. And the way the district court read it is it could be deemed an instruction that the estimates were void or the projections were void. But think about what's happening in this contract. So the minimum fee provision, if it's unambiguous, when we get an estimate or a projection from APS, that gives Summit a contractual right. It's a legal right that Summit owns at that point in time. To bill on that. To bill a minimum fee based on that estimate. And so the question is, can APS take that right away by voiding the contract or by sending an email? By saying something which could be read to mean these projections or estimates are not valid. They are no longer things you can rely on. Yes. I mean, I think that's the statement that you could read into that. But then there's the legal question of, are you allowed to do that? Are they allowed to take back the projections? Or you mean that the projections that they made have to continue indefinitely? Are they able to take back the legal right that has been created under the contract to charge minimum fees? No. To charge minimum fees on the basis of these particular projections. Well, once that legal right is created, Your Honor, it doesn't just disappear. It can't just be taken back. Or it could only be taken back if the contract provided a right to take it back. And there's been no argument and no evidence that there's anything in the contract that allowed APS to take back its estimates and extinguish that legal right after it was created. Well, if they, if Mr. Hines had, and I think this is what he's saying in this email, had said more explicitly, we have been providing you with the wrong estimates going forward. These are the estimates that you should rely on in connection with figuring out both staffing and billing. What in the contract prevents them from doing that? And commercially, doesn't that make sense, that people make mistakes and they revise their estimates going forward? I certainly think they could have revised their estimates going forward. But what revise the estimate would mean is they had given us numbers before. And you really need a number to plug into the formula. An estimate is a number in this context. Could they say, and that's the question, these projections aren't good and we don't have new ones for you now, which is what they did in a way, and you then said, well, we don't go forward unless we get new ones. And then, and you stopped because you stopped doing things. And at that point, they gave you new ones. Why isn't that, what in the contract stops that from being done? Saying, hey, we don't have new projections, so all we can tell you is stop using the other one. And maybe even say, and by the way, if you want to stop working, you're not reaching the contract, because at that point you don't have projections. I mean, I think, I agree with a lot of what you said, but that's not what happened in this agreement. What happened is the estimates were provided and they were good faith estimates. The people who created them did not change their testimony that these were the good faith estimates. So they didn't come and say, hold on, our estimates are wrong. This one says 200. I'm going to change it to 120. If they had done that, and that's a total counterfactual hypothetical, then they would have a good argument that we could only charge minimum fees based on the 120. But could they say, hold on, these estimates are wrong. Don't rely on them until we give you new ones. I don't think once they've provided an estimate and given us that legal right, they can just put the ability to exercise that legal right on hold, just in the same way that I don't think they can extinguish it just by sending an e-mail. So, I mean, the Heinz e-mail didn't say exactly what Your Honor suggested, but in my view there's no e-mail that they could have sent that would have extinguished that legal right that we got from their provision of a good faith estimate. Thanks very much. Thank you, Your Honors. Mr. Rosenblatt, we've reserved some time. I have, Your Honor, and first to the cross appeal. And that was the issue that was tried. That was the issue I tried. And it was unequivocal to me, but the district court left it for the jury, as to the effect of the e-mail on any projections that had been given, as the district court labeled them. We obviously called them guesses prior to that. There was an agreement that it would go to the jury, right? Excuse me? There was an agreement, was there not, that this question of the e-mail would go to the jury? Ultimately there was an agreement, and it was undisputed throughout the case, and I'm somewhat surprised at my friend's articulation, is that Summit had conceded all along that APS could always change the estimates, and the district court found there's nothing specific in the agreement that requires an estimate at all. So for that reason, we went to the jury as to the effect of that e-mail, and the jury found that from that point forward, any prior estimate or projection or guess, depending on which label you want to use, had no effect for purposes of the standard minimum. If there had been in the contract, or if one were to read the contract as saying that an estimate or a projection had to be there, if one read the contract that way, now as you say, the district court did not read it that way, but if there had been that, would what you did be enough when you didn't give a new projection? Again, to use my friend's word, it is counterfactual, and I don't think we can . . . Because you think the court was correct in saying that no estimate was, in fact, needed. It may be that they then could say if there is no estimate, we don't work, but the contract didn't require you to have an estimate. Well, and even counsel's own argument says it's implicit, and that to me concedes our side of the argument, which is in order for a court to imply an obligation, especially one like this, because no one can dispute, there is no express provision that says an estimate must be given or a projection must be given, then the court can only do that on a finding of ambiguity. So we would welcome a finding of ambiguity because we think this contract is ambiguous. I know I'm close to out of time, but I would like to address the purposes of this contract because Mr. Finch, who is the COO of Summit, testified very clearly what he thought the purpose of this minimums provision was, and it was protection. This he put in his declaration. He frankly lied about it, but he said it was protection because Summit staffed to and prepared the clinics to the estimate. That was a false statement. That never happened. So the purpose of it, to the extent there was a legitimate commercially reasonable purpose for requiring a projection, was tied to Summit's statements that it was using them to plan and staff. It didn't use that, and I think the natural reading of this contract, given Summit's obligation to do all planning and the projection and estimate language, particularly the part that ties a participation estimate directly to staffing, is that the only way a customer projection could be used for the standard minimums provision is if it was used for preparation and staffing the clinics. And I'll just make one more quick point because that's what it says in the 200-plus page PowerPoint presentation that Summit gave to APS prior to the contract being entered. Summit put on itself, and this is on page 8 of our moving brief, in the overall, under the heading overall program design, that it would, among other things, develop staffing requirements and assist in estimating participation by site and developing a planned program rollout. So that goes to my overall contextual argument that these so-called customer projections were guesses and they don't have contractual effect under the circumstances, and at a minimum, the contract was ambiguous. Thank you. Thanks very much, Mr. Rosenbaum. And, counsel, we appreciate the argument very much in this case. We'll reserve the decision, and we are adjourned. Court is adjourned.